Barry I. Levy, Esq.
Michael A. Sirignano, Esq.
Steven Henesy, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees*
*Insurance Company, GEICO Indemnity Company,*
*GEICO General Insurance Company and*
*GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL INSURANCE COMPANY and GEICO
CASUALTY COMPANY,                                       Docket No.: _____(      )

                                            Plaintiffs,

        -against-

JOHN STREET PHARMACY, LLC D/B/A ACUTUS RX,
KETUBEN RAVJI, and PATEL KAPREE HOLDINGS,
LLC,

                                            Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively, "GEICO" or

"Plaintiffs"), as and for their Complaint against Defendants, John Street Pharmacy, LLC d/b/a

Acutus Rx, Ketuben Ravji Patel, and Kapree Holdings, LLC (collectively, "Defendants"), hereby

allege as follows:

1.      This action seeks to terminate a large, on-going fraudulent scheme perpetrated by

the Defendants who have exploited the New York "No-Fault" insurance system by submitting

more than $1,693,000.00 in fraudulent pharmaceutical billing to GEICO. Specifically, the Defendants submitted, or caused to be submitted, thousands of fraudulent claims to GEICO seeking payment for a set of specifically targeted medically unnecessary "pain relieving" topical prescription drug products including topical pain gels, ointments and patches – primarily in the form of topical Diclofenac Sodium Gel 3% and Lidocaine 5% Ointment (collectively, the "Fraudulent Topical Pain Products") -- as well as limited set of other medications including oral nonsteroidal anti-inflammatory drugs and muscle relaxers (together with the Fraudulent Topical Pain Products, the "Fraudulent Pharmaceuticals").

2.      Defendants John Street Pharmacy, LLC d/b/a Acutus Rx ("Acutus Rx") and its sole member, Kapree Holdings, LLC ("Kapree Holdings"), together with Kapree Holdings' sole member Ketuben Ravji Patel ("Patel"), dispensed the Fraudulent Pharmaceuticals to individuals involved in automobile accidents and eligible for insurance coverage under policies of insurance issued by GEICO (the "Insureds"). In furtherance of the fraudulent scheme, the Defendants entered into illegal, collusive agreements with various prescribing healthcare providers (the "Prescribing Providers") and/or unlicensed laypersons (the "Clinic Controllers") who work at or are associated with multidisciplinary medical clinics that almost exclusively treat No-Fault patients (the "No-Fault Clinics"). Pursuant to these collusive agreements, in exchange for kickbacks or other financial incentives, the Defendants steered the Prescribing Providers and/or Clinic Controllers to direct large volumes of prescriptions for the targeted Fraudulent Topical Pain Products and other Fraudulent Pharmaceuticals to Acutus Rx.

3.      In many cases, Acutus Rx dispensed prescriptions that were not only medically unnecessary, but also were unauthorized by the purported Prescribing Provider and, instead, steered to Acutus Rx in exchange for kickbacks paid by the Clinic Controllers. In fact, the

2

Prescribing Provider whose name appears on the highest number of prescriptions connected to the claim submissions from Acutus Rx to GEICO testified under oath that the prescriptions sent under his name were fraudulent and unauthorized.

4.    The Defendants targeted the prescription and dispensing of the Fraudulent Topical Pain Products in place of other effective, but much-less costly prescription and non-prescription drug products because the Defendants were able to acquire the Fraudulent Topical Pain Products at low cost and then dispense and bill for them at exorbitant prices. Further, the Defendants knew that the high profit margins generated from dispensing the Fraudulent Topical Pain Products allowed them to pay kickbacks in exchange for receiving a high volume of the prescriptions without any regard for genuine patient care.

5.    The Defendants' scheme to steer Prescribing Providers and Clinic Controllers to routinely prescribe and direct prescriptions to Acutus Rx for large volumes of the Fraudulent Topical Pain Products pursuant to their collusive arrangements egregiously inflated the charges submitted to GEICO.  For example, Acutus Rx typically submitted claims to GEICO seeking $1,887.20 to $2,358.92 for a single tube of Diclofenac Sodium Gel 3% and $1,219.04 for a single tube of Lidocaine 5% Ointment.

6.    By this action, GEICO seeks to recover more than $352,600.00 that the Defendants stole from it, along with a declaration that GEICO is not legally obligated to pay reimbursement to Acutus Rx of over $947,435.00 in pending fraudulent No-Fault claims that the Defendants submitted or caused to be submitted through Acutus Rx because:

> (i)    Acutus Rx billed for pharmaceutical products that were medically unnecessary and prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care;

(ii)     The Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and/or Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Acutus Rx in exchange for unlawful kickbacks and other financial incentives;

(iii)    the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they acquired at low cost and had Acutus Rx dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals; and

(iv)     the Defendants made and continue to make false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals under the name of Acutus Rx pursuant to illegal, invalid, and duplicitous prescriptions.

7.     The Defendants fall into the following categories:

(i)     Acutus Rx is a Delaware corporation engaged in a fraudulent scheme in which it dispensed the Fraudulent Pharmaceuticals, pursuant to illegal, collusive agreements and predetermined protocols, without regard to genuine patient care, in order to submit to GEICO and other New York automobile insurers claims for reimbursement of No-Fault benefits to which it is not entitled; and

(ii)     Kapree Holdings, with Patel as its sole member, is the sole owner of Acutus Rx.  Patel is also Acutus Rx's supervising pharmacist.

8.     The Defendants' scheme began in 2020 and continues uninterrupted to the present day. As discussed more fully below, the Defendants at all times have known that: (i) pharmaceutical products billed through Acutus Rx were medically unnecessary, and prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which they steered the Prescribing Providers and/or Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Acutus Rx in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they

4

acquired at low cost and had Acutus Rx dispense in large volumes to Insureds at exorbitant charges, in place of other effective, less costly pharmaceuticals; and (iv) the Defendants made and continue to make false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals pursuant to illegal, invalid, and duplicitous prescriptions.

9.      Based on the foregoing, Acutus Rx does not have – and never had – any right to be compensated for the Fraudulent Pharmaceuticals allegedly dispensed to GEICO Insureds.  The chart attached hereto as Exhibit "1" sets forth the fraudulent claims that have been identified to-date which the Defendants submitted, or caused to be submitted, to GEICO through the United States mail.  As a result of the Defendants' scheme, GEICO has incurred damages of more than $352,600.00.

<strong><u>THE PARTIES</u></strong>

**I.      <u>Plaintiffs</u>**

10.      Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

**II.      <u>Defendants</u>**

11.      Defendant John Street Pharmacy, LLC d/b/a Acutus Rx ("Acutus Rx") is a foreign limited liability company formed in Delaware on March 18, 2019 and registered with the New York State Division of Corporations on March 21, 2019.  Acutus Rx's principal place of business is located in Hicksville, Nassau County, New York.

12.    Acutus Rx knowingly submitted fraudulent claims to GEICO and continues to seek reimbursement on unpaid fraudulent claims.

13.    Despite being located in Nassau County, approximately 90% of the Insureds to whom Acutus Rx dispensed Fraudulent Pharmaceuticals resided in New York City.

14.    Defendant Kapree Holdings is a limited liability company registered with the New York State Division of Corporations on March 18, 2019, and is the sole member of Acutus Rx. Kapree Holdings' principal place of business is located in Roslyn Heights, Nassau County, New York .

15.    Defendant Patel is a citizen of New York, residing in Roslyn Heights, Nassau County, New York.  Patel is the sole member of Kapree Holdings, which is the sole member of Acutus Rx.  Patel, along with Kapree Holdings, controls and operates Acutus Rx.

16.    Patel is registered with the New York State Office of Professions as the supervising pharmacist for Acutus Rx.

17.    Patel, as the supervising pharmacist of Acutus Rx, is responsible by law for conformance with all laws and regulations applicable to the conduct of the pharmacy along with the owner of the pharmacy.

18.    Patel, furthermore, as the supervising pharmacist of Acutus Rx, is required by law to be knowledgeable of, and direct and control, the pharmacy at Acutus Rx, including but not limited to overseeing any other employed pharmacists, insuring that unlicensed persons do not engage in unlawful activity, keeping in proper form all records relating to the purchase and dispensing of all prescription drugs, and insuring against unauthorized refills of prescriptions and unauthorized sale of drugs.

**JURISDICTION AND VENUE**

19.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

20.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331, over the claims brought under 18 U.S.C. §§ 1961 et seq., the Racketeer Influenced and Corrupt Organizations ("RICO") Act, because they arise under the laws of the United States.

21.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

22.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

**ALLEGATIONS COMMON TO ALL CLAIMS**

I.     **An Overview of New York's No-Fault Laws**

23.     GEICO underwrites automobile insurance in the State of New York.

24.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101 et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65 et seq.)(collectively, referred to herein as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to the Insureds.

25.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for health care goods and services.

26.    An Insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services. Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary goods and medical services provided, using the claim form required by the New York State Department of Insurance (known as the "Verification of Treatment by Attending Physician or Other Provider of Health Service," or, more commonly, as an "NF-3").    Alternatively, healthcare providers sometimes submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

27.    Pursuant to New York's No-Fault Laws (11 N.Y.C.R.R. § 65-3.16(a)(12)), a healthcare provider is not eligible to receive No-Fault Benefits if it fails to meet any applicable New York state or local licensing requirement necessary to perform such services in New York.

28.    The implementing regulation adopted by the Superintendent of Insurance, 11 NYCRR § 65-3.16(a)(12), provides, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York … (emphasis supplied).

29.    In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005) and Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and (ii) only licensed providers may practice a profession in New York because of the concern that unlicensed persons are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient.".

30.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 Forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.      An Overview of Applicable Licensing Laws

31.     Pursuant to New York Education Law § 6808, no person, firm, corporation or association shall possess drugs, prescriptions or poisons for the purpose of compounding, dispensing, retailing, wholesaling or manufacturing, or shall offer drugs, prescriptions or poisons for sale at retail or wholesale unless registered by the New York State Department of Education as a pharmacy, wholesaler, manufacturer or outsourcing facility.

32.     Pursuant to 8 N.Y.C.R.R. § 29.1 pharmacies in New York are prohibited from "exercising undue influence on the patient or client, including the promotion of the sale of services, goods, appliances or drugs in such manner as to exploit the patient or client for the financial gain of the practitioner or of a third party."

33.     Similarly, 8 N.Y.C.R.R. § 29.1 prohibits pharmacies from "directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services."

34.     Pursuant to 8 N.Y.C.R.R. § 63.1(7) pharmacists or pharmacy interns shall conduct a prospective drug review before each prescription is dispensed, which review shall include screening for potential drug therapy problems due to contraindications for use, therapeutic

duplication, drug-drug interactions, including serious interactions with over-the-counter drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

35.     New York Education Law § 6810 prohibits pharmacies from dispensing when a prescription form for a drug includes any other drug.  Separate prescriptions are required for each drug prescribed and dispensed.

36.     New York Education Law § 6810 prohibits persons and corporations, not licensed to issue a prescription, to willfully cause prescription forms, blanks, or facsimiles thereof to be disseminated to any person other than a person who is licensed to issue a prescription.

37.     Pursuant to New York Education Law § 6808, pharmacy owners and supervising pharmacists shall be responsible for the proper conduct of a pharmacy.

38.     New York Education Law § 6530(17) prohibits a physician from "exercising undue influence" on the patient by promoting the sale of drugs so as to exploit the patient for the financial gain of the licensee or of a third party.

39.     New York Education Law § 6530(18) prohibits a physician from "directly or indirectly" offering, giving, soliciting, receiving, or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

40.     New York Education Law § 6509-a, prohibits a professional licensee from "directly or indirectly" requesting, receiving, or participating in the division, transference, assignment, rebate, splitting, or refunding of a fee in connection with professional care or services including services related to drugs and/or medications.

**III.    The Defendants' Scheme Involving The Fraudulent Pharmaceuticals**

**A.    Overview of the Scheme**

41.    Beginning in 2020, and continuing uninterrupted through the present day, Defendants masterminded and implemented a fraudulent scheme in which they used Acutus Rx to exploit patients for financial gain by billing the New York automobile insurance industry for millions of dollars in exorbitant charges relating to the Fraudulent Pharmaceuticals purportedly provided to Insureds.

42.    Unlike legitimate pharmacies dispensing a wide variety of pharmaceutical products, Acutus Rx's business is largely focused on a limited set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products).

43.    In fact, topical diclofenac and lidocaine products account for approximately 86% of the total claims for reimbursement that Defendants submitted to GEICO. The claims the Defendants submitted through Acutus Rx for these specific Fraudulent Topical Pain Products have resulted in more than $1,400,000.00 in billing to GEICO.

44.    Not surprisingly, the Office of the Inspector General of the U.S. Department of Health and Human Services noted that diclofenac and lidocaine and have been two of the most common products subject to fraud and abuse by pharmacies with questionable billing. See Questionable Billing For Compounded Topical Drugs in Medicare Part D, OEI-02-16-00440 (August 2018). This report also noted that many pharmacies in New York State are among the most questionable in the nation.

45.    The Defendants chose the Fraudulent Topical Pain Products (*i.e.*, topical Diclofenac Sodium Gel 3% and Lidocaine 5% Ointment) because they knew that (i) similar over-the-counter drugs that could be recommended to Insureds are not covered expenses under the No-

Fault Laws and (ii) they could acquire the Fraudulent Topical Pain Products at low cost and submit claims for reimbursement under the No-Fault Laws at exorbitant prices.

46. In furtherance of the fraudulent scheme, the Defendants entered into illegal, collusive agreements with the Prescribing Providers and/or the Clinic Controllers where, in exchange for the payment of kickbacks, they steered the Prescribing Providers and the Clinic Controllers to prescribe large volumes of medically unnecessary Fraudulent Topical Pain Products to Insureds treating at various No-Fault Clinics and to direct those prescriptions to Acutus Rx.

47. The No-Fault Clinics and the healthcare providers operating therefrom who directed prescriptions to Acutus Rx were predominantly located in the New York City area have often been the subject of investigations and lawsuits commenced by various New York insurers with regard to their fraudulent billing and treatment practices, and have been the source of excessive, fraudulent treatment and billing schemes aimed at generating profits without regard to patient care.

48. Unlicensed laypersons, rather than the healthcare professionals working in the Clinics, create and control the patient bases at the Clinics, and dictate predetermined fraudulent treatment protocols used to maximize profits without regard to actual patient care.

49. The Prescribing Providers who steered the highest number of prescriptions for the Fraudulent Pharmaceuticals to Acutus Rx were associated with Metro Pain Specialists P.C. ("Metro Pain"), a professional corporation operating at multiple No-Fault Clinics that has been named as a defendant in recent affirmative fraud cases involving fraudulent services billed to No-fault insurers, including State Farm Mut. Ins. Co. v. Metro Pain Specialists, P.C., et al, 21-cv-05523 (E.D.N.Y. 10/5/2021) and Allstate Ins. Co. v. Metro Pain Specialists P.C., et al., 21-cv-05586-DG-RER (E.D.N.Y. 10/7/2021).

50. Notably, William Elton, M.D., a physician formerly employed by Metro Pain and who allegedly authorized the majority of the prescriptions submitted by Acutus Rx in support of its claims, testified under oath that he resigned from Metro Pain when he discovered they were fraudulently prescribing medications in his name for diclofenac 3% gel and sending them to Acutus Rx.

51. The No-Fault Clinics from where prescriptions were steered to Acutus Rx present themselves to be legitimate healthcare practices when, in fact, they are medical mills that house a "revolving door" of numerous healthcare providers who subject Insureds to as many healthcare goods and services as possible in order to exploit the Insureds' No-Fault Benefits by submitting large volumes of fraudulent claims to No-Fault insurers such as GEICO.

52. For example, GEICO has received billing for purported healthcare services rendered at 90-16 Sutphin Boulevard, Jamaica, New York from a "revolving door" of over 110 purportedly different healthcare providers, which clinic was a major source of prescriptions that Acutus Rx submitted to GEICO in support of its charges.

53. As a further example, GEICO has received billing for purported healthcare services rendered at 1414 Newkirk Avenue, Brooklyn, New York, from a "revolving door" of approximately 18 purportedly different healthcare providers, which clinic was another source of prescriptions that Acutus Rx submitted to GEICO in support of its charges.

54. In keeping with the fact that the Defendants entered into illegal, collusive agreements with the Prescribing Providers and/or the Clinic Controllers, some of the Prescribing Providers working at the No-Fault Clinics from where prescriptions were steered to Acutus Rx typically have histories of professional misconduct making them amenable to employment furthering fraudulent schemes against insurers.

55.     For example, Hong Sik Pak, M.D. ("Dr. Pak"), one of the physicians employed by Metro Pain who steered prescriptions to Acutus Rx, was disciplined by the New Jersey State Board of Medical Examiners, receiving a $5,000.00 penalty and a public reprimand in 2009.  The Pennsylvania Department of State also reprimanded Dr. Pak and assessed a civil penalty on Dr. Pak in connection with the failure to report the New Jersey proceedings.

56.     Michael Alleyne, M.D. ("Dr. Alleyne") is another one of the physicians employed by Metro Pain who steered prescriptions to Acutus Rx, and he admitted guilt in 1991 in response to a series of charges file by the New York State Department of Health, Office of Professional Medical Conduct which resulted in seven-year license revocation that was converted to probation.

57.     In keeping with the fact that the Defendants illegally steered the Prescribing Providers and/or the Clinic Controllers to provide Acutus Rx with prescriptions for the Fraudulent Pharmaceuticals pursuant to predetermined fraudulent protocols, Insureds were never given the option to use a pharmacy of their choosing.

58.     Instead, the Defendants colluded with the Prescribing Providers and Clinic Controllers to ensure that they directed the prescriptions for the Fraudulent Pharmaceuticals to Acutus Rx, regardless of the distance of this pharmacy from the Insureds or the No-Fault Clinics where they were treating.

59.     In fact, only approximately 6% of Insureds who received prescriptions from Acutus Rx resided in Nassau County where Acutus Rx is located, while nearly 90% of Insureds resided in New York City.

60.     In most cases, Acutus Rx either purported to deliver or mail the Fraudulent Pharmaceuticals directly to Insureds' homes or the Fraudulent Pharmaceuticals were given to Insureds directly by the front desk staff at the various No-Fault Clinics.

14

61.    In most cases, Insureds were not aware that a prescription for a Fraudulent Pharmaceutical was issued to them and dispensed by Acutus Rx until the medication was delivered to their homes or distributed to them by the front desk staff at the No-Fault Clinics.

62.    The Defendants spearheaded their pharmaceutical fraud scheme involving the Prescribing Providers and the Clinic Controllers knowing that (i) the Fraudulent Pharmaceuticals were medically unnecessary, and prescribed and dispensed pursuant to predetermined protocols designed to exploit the patients for financial gain, without regard to evidence based medicine known to provide genuine patient care; (ii) the Fraudulent Pharmaceuticals were the product of illegal, collusive arrangements intended to inflate the billing from Acutus Rx to insurers and financially enrich the Defendants; (iii) the Defendants intentionally targeted the specific Fraudulent Topical Pain Products which they acquired at low cost and dispensed in large volumes to Insureds at inflated charges; and (iv) the Defendants made and continue to make false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals under the name of Acutus Rx pursuant to illegal, invalid, and duplicitous prescriptions.

**B.      The Fraudulent Pharmaceuticals Were Prescribed and Dispensed Without Regard to Genuine Patient Care In Order to Exploit Patients for Financial Gain**

63.    In basic terms, the goal of medical treatment is to help patients get better in a timely manner. Notwithstanding this basic goal, Insureds treated by the Prescribing Providers at the No-Fault Clinics associated with the Clinic Controllers – and who received pharmaceuticals from Acutus Rx – were virtually always subjected to a predetermined and unnecessarily prolonged treatment protocol, which completely lacked in individualized care and failed to utilize evidence-based medical practices with the goal of the Insureds' timely return to good health.

15

64. Despite this basic goal, the treatment reports for the Insureds who received Fraudulent Pharmaceuticals from Acutus Rx almost uniformly reflected that the Insureds did not get better, did not return to good health, and did not experience improvement in their conditions such that the Insureds could terminate medical treatment expeditiously and return to normal activity.

65. Rather, as part of the predetermined protocol, the Prescribing Providers produced generic, preprinted, boilerplate examination reports designed to justify continued, voluminous and excessive healthcare services that healthcare providers at the No-Fault Clinics purported to render to the Insureds. These healthcare services included the prescription of excessive and medically unnecessary pharmaceutical drug products such as the Fraudulent Pharmaceuticals dispensed by Acutus, Rx.

66. Notwithstanding the creation of the examination reports, the Prescribing Providers' prescriptions for the Fraudulent Pharmaceuticals dispensed by Acutus Rx were based on predetermined protocols designed to exploit Insureds' for financial gain, without regard to the genuine needs of the patients.

67. To the extent any examination was performed at all, the Prescribing Providers failed to document a detailed medical history of the patients to whom they prescribed the Fraudulent Pharmaceuticals.

68. Prescribing a multitude of pharmaceutical drug products without first taking a detailed patient history demonstrates a gross indifference to patient health and safety, as the Prescribing Providers often did not know whether the patient was currently taking any medication or suffering from any comorbidity that would contraindicate the use of a particular prescribed drug.

16

69.     The Prescribing Providers also routinely failed to document in their examination reports whether the patients were intolerant of oral medications necessitating a prescription for a Fraudulent Topical Pain Product.

70.     The Prescribing Providers also routinely failed to document in their follow-up examination reports whether the Fraudulent Pharmaceuticals prescribed to a particular patient and dispensed by Acutus Rx were actually used by the patient.

71.     The Prescribing Providers also continuously failed to document in their follow-up examination reports whether the Fraudulent Pharmaceuticals prescribed to a particular patient and dispensed by Acutus Rx provided any pain relief to the patient or were otherwise effective for the purpose prescribed.

72.     At times, the recommendation and treatment plans of a Prescribing Provider's examination reports were inconsistent with the medications actually prescribed and dispensed. For example:

    i.    Insured TC was allegedly involved in a motor vehicle accident on October 5, 2020. Thereafter, TC sought treatment with Metro Pain Specialists, P.C. ("Metro Pain") at a No-Fault Clinic located at 90-16 Sutphin Boulevard, Jamaica, New York, and underwent an initial examination with William Elton, M.D. ("Dr. Elton") on October 21, 2020.  Dr. Elton documented a prescription for Lidocaine 5% Ointment under the treatment plan section of the examination report. Nevertheless, on November 2, 2020, Acutus Rx dispensed and billed for Lidocaine 5% Ointment and two tubes of Diclofenac Sodium Gel 3% pursuant to prescriptions allegedly issued by Dr. Elton on dated October 21, 2020. Notably, Dr. Elton testified under oath that he resigned from Metro Pain when he discovered they were issuing prescriptions for medications without his authorization, including Diclofenac Gel 3%, and forwarding those prescriptions to Acutus Rx.

    ii.    Insured RK was allegedly involved in a motor vehicle accident on April 27, 2020. Thereafter, RK sought treatment with Metro Pain at a No-Fault Clinic located at 90-16 Sutphin Boulevard, Jamaica, New York, and underwent an initial examination with Hong Pak, M.D. ("Dr. Pak") on April 28, 2020.  Dr. Pak did not document any medication under the treatment plan section of the examination report, thereby, indicating no medication was recommended or

prescribed. Nevertheless, on May 7, 2020, Acutus Rx dispensed and billed for Lidocaine 5% Ointment and Diclofenac Sodium Gel 3% pursuant to a prescription allegedly issued by Dr. Pak on dated April 28, 2020.

iii.    Insured DK was allegedly involved in a motor vehicle accident on April 12, 2021. Thereafter, DK sought treatment with Metro Pain at a No-Fault Clinic located at 90-16 Sutphin Boulevard, Jamaica, New York, and underwent an initial examination with Inna Levtsenko, N.P. ("NP Levtsenko") on April 14, 2021. NP Levtsenko did not document any medication under the treatment plan section of the examination report, thereby, indicating no medication was recommended or prescribed. Nevertheless, on April 29, 2021, Acutus Rx dispensed and billed for Lidocaine 5% Ointment, Diclofenac Sodium Gel 3%, and Cyclobenzaprine pursuant to prescriptions allegedly issued by NP Levtsenko on dated April 15, 2021.

iv.    Insured MM was allegedly involved in the same motor vehicle accident as DK, supra, on April 12, 2021. Thereafter, MM sought treatment with Metro Pain at a No-Fault Clinic located at 90-16 Sutphin Boulevard, Jamaica, New York, and underwent an initial examination with NP Levtsenko on April 14, 2021. NP Levtsenko did not document any medication under the treatment plan section of the examination report, thereby, indicating no medication was recommended or prescribed. Nevertheless, on April 29, 2021, Acutus Rx dispensed and billed for Lidocaine 5% Ointment, Diclofenac Sodium Gel 3%, and Cyclobenzaprine pursuant to prescriptions allegedly issued by NP Levtsenko on dated April 15, 2021.

v.    Insured EP was allegedly involved in a motor vehicle accident on December 21, 2019. Thereafter, EP sought treatment with Metro Pain at a No-Fault Clinic located at 90-16 Sutphin Boulevard, Jamaica, New York, and underwent a follow-up examination with Camari Wallace, M.D. ("Dr. Wallace") on March 25, 2020. Dr. Wallace documented a prescription for Ibuprofen under the treatment plan section of the examination report. Nevertheless, on April 15, 2020, Acutus Rx dispensed and billed for Diclofenac Sodium Gel 3% and Ibuprofen pursuant to prescriptions allegedly issued by Dr. Wallace on dated March 25, 2020.

vi.    Insured JR was allegedly involved in a motor vehicle accident on September 2, 2020. Thereafter, JR sought treatment with Metro Pain at a No-Fault Clinic located at 90-16 Sutphin Boulevard, Jamaica, New York, and underwent an initial examination with Dr. Elton on September 3, 2020. Dr. Elton did not document any medication under the treatment plan section of the examination report, thereby, indicating no medication was recommended or prescribed. Nevertheless, on September 18, 2020, Acutus Rx dispensed and billed for Diclofenac Sodium Gel 3% pursuant to a prescription allegedly issued by Dr. Elton on dated September 3, 2020. Further, on October 15, 2020, Acutus Rx dispensed and billed a refill for Diclofenac Sodium Gel 3% pursuant to the same

prescription allegedly issued by Dr. Elton on dated September 3, 2020. <u>Notably, Dr. Elton testified under oath that he resigned from Metro Pain when he discovered they were issuing prescriptions for medications without his authorization, including Diclofenac Gel 3%, and forwarding those prescriptions to Acutus Rx.</u>

vii. Insured HA was allegedly involved in a motor vehicle accident on August 28, 2020. Thereafter, HA sought treatment with Metro Pain at a No-Fault Clinic located at 90-16 Sutphin Boulevard, Jamaica, New York, and underwent an initial examination with Dr. Elton on September 1, 2020. Dr. Elton did not document any medication under the treatment plan section of the examination report, thereby, indicating no medication was recommended or prescribed. Nevertheless, on September 14, 2020, Acutus Rx dispensed and billed for Lidocaine 5% Ointment pursuant to a prescription allegedly issued by Dr. Elton on dated September 10, 2020, even though he did not examine the Insured on that date. <u>Notably, Dr. Elton testified under oath that he resigned from Metro Pain when he discovered they were issuing prescriptions for medications without his authorization, including Diclofenac Gel 3%, and forwarding those prescriptions to Acutus Rx.</u>

viii. Insured JC was allegedly involved in a motor vehicle accident on January 14, 2020. Thereafter, JC sought treatment with FJ Orthopaedics & Pain MGMT, PLLC ("FJ Orthopaedics") at a No-Fault Clinic located at 1414 Newkirk Avenue, Brooklyn, New York, and underwent an examination with Jonathan Simhaee, M.D. ("Dr. Simhaee") on November 19, 2020. In the examination report, Dr. Simhaee first documented that JC had "No Current Medications" and later documented – in the same report – that JC was to "Continue current medications." Nevertheless, on November 24, 2020, Acutus Rx dispensed and billed for Diclofenac Sodium Gel 3% and Cyclobenzaprine pursuant to prescriptions allegedly issued by Dr. Simhaee on dated November 19, 2020.

73. In keeping with the fact that the Fraudulent Pharmaceuticals were not medically necessary and were prescribed pursuant to predetermined protocols to maximize profits, patients frequently received their medications weeks after they were purportedly prescribed. For example:

i. Insured TF was allegedly involved in a motor vehicle accident on December 13, 2017. Thereafter, TF allegedly sought treatment with Total Neuro Care, P.C. ("Total Neuro Care") at a No-Fault Clinic located at 1513 Voorhies Avenue, Brooklyn, New York, and allegedly underwent an examination with Ranga Krishna, M.D. ("Dr. Krishna") on September 4, 2020. There were no medical records submitted to GEICO from this visit with Dr. Krishna. <u>Forty-nine days later</u>, on October 22, 2020, Acutus Rx dispensed and billed for Diclofenac Sodium Gel 1.5% pursuant to a prescription allegedly issued by Dr. Krishna on

19

September 4, 2020, even though Dr. Krishna did not examine the Insured on that date.

ii. Insured FM was allegedly involved in a motor vehicle accident on June 4, 2020. Thereafter, FM sought treatment with Total Neuro Care at a No-Fault Clinic located at 1513 Voorhies Avenue, Brooklyn, New York, and underwent an initial examination with Dr. Krishna on January 22, 2021. There were no medical records submitted to GEICO from this visit with Dr. Krishna. Nevertheless, forty-six days later, on March 8, 2021, Acutus Rx dispensed and billed for Diclofenac Sodium Gel 1.5% pursuant to the prescription allegedly issued by Dr. Krishna on January 22, 2021, even though Dr. Krishna did not examine the Insured on that date.

iii. Insured RM was allegedly involved in a motor vehicle accident on December 1, 2020. Thereafter, RM sought treatment with Metro Pain at a No-Fault Clinic located at 90-16 Sutphin Boulevard, Jamaica, New York, and underwent an initial examination with Deonarine Rampershad, N.P. ("NP Rambershad") on December 23, 2020. NP Rampershad prescribed Naproxen and Cyclobenzaprine. Forty-three days later, on February 4, 2021, Acutus Rx dispensed and billed for *Diclofenac Sodium Gel 3%*, Cyclobenzaprine, and Naproxen pursuant to the prescription allegedly issued by NP Rampershad on December 23, 2020.

iv. Insured CA was allegedly involved in a motor vehicle accident on January 15, 2020. Thereafter, CA sought treatment with Metro Pain at a No-Fault Clinic located at 90-16 Sutphin Boulevard, Jamaica, New York, and underwent an initial examination with Dr. Elton on July 23, 2020. Dr. Elton prescribed Diclofenac Sodium Gel 3%. Forty days later, on September 1, 2020, Acutus Rx dispensed and billed for Diclofenac Sodium Gel 3% pursuant to the prescription allegedly issued by Dr. Elton on July 23, 2020. Notably, Dr. Elton testified under oath that he resigned from Metro Pain when he discovered they were issuing prescriptions for medications without his authorization, including Diclofenac Gel 3%, and forwarding those prescriptions to Acutus Rx

v. Insured EW was allegedly involved in a motor vehicle accident on November 12, 2020. Thereafter, EW sought treatment with Metro Pain at a No-Fault Clinic located at 90-16 Sutphin Boulevard, Jamaica, New York, and underwent an initial examination with Dr. Elton on November 17, 2020. Dr. Elton prescribed Lidocaine 5% Ointment. Thirty-six days later, on December 23, 2020, Acutus Rx dispensed and billed for Lidocaine 5% Ointment pursuant to the prescription allegedly issued by Dr. Elton on November 17, 2020.

vi. Insured MR was allegedly involved in a motor vehicle accident on December 11, 2020. Thereafter, MR sought treatment with Metro Pain at a No-Fault Clinic located at 90-16 Sutphin Boulevard, Jamaica, New York, and underwent an initial examination with NP Rampershad on February 3, 2021. NP Rampershad

prescribed Diclofenac Sodium Gel 3%, Lidocaine Patches, and Naproxen. Thirty days later, on March 5, 2021, Acutus Rx dispensed and billed for Lidocaine Patches, Diclofenac Sodium Gel 3%, and *Celecoxib* pursuant to the prescription allegedly issued by NP Rampershad on February 3, 2021.

vii.    Insured TC was allegedly involved in a motor vehicle accident on October 5, 2020. Thereafter, TC sought treatment with Metro Pain at a No-Fault Clinic located at 90-16 Sutphin Boulevard, Jamaica, New York, and underwent an initial examination with Dr. Elton on October 21, 2020.  Dr. Elton prescribed Lidocaine 5% Ointment. Twenty-nine days later, on November 2, 2020, Acutus Rx dispensed and billed for *Diclofenac Sodium Gel 3%* pursuant to the prescription allegedly issued by Dr. Elton on October 21, 2020. Notably, Dr. Elton testified under oath that he resigned from Metro Pain when he discovered they were issuing prescriptions for medications without his authorization, including Diclofenac Gel 3%, and forwarding those prescriptions to Acutus Rx.

viii.   Insured MM was allegedly involved in a motor vehicle accident on July 18, 2020. Thereafter, MM sought treatment with Metro Pain at a No-Fault Clinic located at 90-16 Sutphin Boulevard, Jamaica, New York, and underwent an initial examination with Dr. Elton on July 23, 2020.  Dr. Elton prescribed Diclofenac Sodium Gel 3%. Twenty-nine days later, on August 21, 2020, Acutus Rx dispensed and billed for Diclofenac Sodium Gel 3% pursuant to the prescription allegedly issued by Dr. Elton on July 23, 2020. Notably, Dr. Elton testified under oath that he resigned from Metro Pain when he discovered they were issuing prescriptions for medications without his authorization, including Diclofenac Gel 3%, and forwarding those prescriptions to Acutus Rx.

ix.    Insured JO was allegedly involved in a motor vehicle accident on February 2, 2021. Thereafter, JO sought treatment with Metro Pain at a No-Fault Clinic located at 90-16 Sutphin Boulevard, Jamaica, New York, and underwent an initial examination with NP Rambershad on February 11, 2021.  NP Rampershad prescribed Lidocaine Patches, Naproxen, and Diclofenac Sodium Gel 3%. Twenty-one days later, on March 4, 2021, Acutus Rx dispensed and billed for Lidocaine Patches, *Celecoxib*, and Diclofenac Sodium Gel 3% pursuant to the prescription allegedly issued by NP Rampershad on February 11, 2021.

x.     Insured SP was allegedly involved in a motor vehicle accident on January 20, 2021. Thereafter, SP sought treatment with Metro Pain at a No-Fault Clinic located at 90-16 Sutphin Boulevard, Jamaica, New York, and underwent an initial examination with Osewa Olatokunbo, F.N.P. ("FNP Olatokunbo") on January 21, 2021.  FNP did not document any medication under the treatment plan section of the examination report, thereby, indicating no medication was recommended or prescribed. Fourteen days later, on February 4, 2021, Acutus

Rx dispensed and billed for Lidocaine Patches and Cyclobenzaprine pursuant to the prescription allegedly issued by FNP Olatokunbo on January 21, 2021.

74. In further keeping with the fact that the Fraudulent Pharmaceuticals were not medically necessary and were prescribed and dispensed pursuant to fraudulent treatment protocols and collusive agreements, at times two or more Insureds involved in the same minor motor vehicle accident received prescriptions for the same set of Fraudulent Pharmaceuticals at the time of their initial examinations with a Prescribing Provider.

75. An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact will all affect whether, how, and to what extent an individual is injured in an automobile accident.

76. It is extremely improbable – to the point of impossibility – that multiple Insureds involved in the same automobile accident who treated with the same Prescribing Provider would routinely require the same pharmaceutical products.

77. Even so, and in keeping with the fact that the Fraudulent Pharmaceuticals were not medically necessary and were prescribed pursuant to predetermined protocols to maximize profits, at times two or more Insureds involved in the same minor motor vehicle accident received prescriptions for the same set of Fraudulent Pharmaceuticals at the time of their initial examinations with a Prescribing Provider. For example:

i. On March 3, 2021, two Insureds – DN and RB – were involved in the same automobile accident. Thereafter, DN and RB received treatment with Metro Pain at a No-Fault Clinic located at 90-16 Sutphin Boulevard, Jamaica, New York with Michael Alleyne, M.D. ("Dr. Alleyne"). DN and RB were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with the Defendants, after their initial examinations DN and RB were issued prescriptions from Dr. Alleyne for Lidocaine 5% Ointment, Celecoxib, and Cyclobenzaprine which were dispensed and billed by Acutus Rx.

ii. On October 14, 2020, three Insureds – JB, RD, and SR – were involved in the same automobile accident. Thereafter, JB, RD, and SR received treatment with Metro Pain at a No-Fault Clinic located at 90-16 Sutphin Boulevard, Jamaica, New York with Dr. Elton. JB, RD, and SR were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with the Defendants, after their initial examinations JB, RD, and SR were issued prescriptions from Dr. Elton for Diclofenac Sodium Gel 3% which were dispensed and billed by Acutus Rx.

iii. On October 25, 2020, five Insureds – RA, DW, TE, LA, and DA – were involved in the same automobile accident. Thereafter, RA, DW, TE, LA, and DA received treatment with Metro Pain at a No-Fault Clinic located at 90-16 Sutphin Boulevard, Jamaica, New York with Dr. Elton. RA, DW, TE, LA, and DA were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with the Defendants, after their initial examinations RA, DW, TE, LA, and DA were issued prescriptions from Dr. Elton for Diclofenac Sodium Gel 3% which were dispensed and billed by Acutus Rx.

iv. On April 12, 2021, three Insureds – MK, DK, and MM – were involved in the same automobile accident. Thereafter, MK, DK, and MM received treatment with Metro Pain at a No-Fault Clinic located at 90-16 Sutphin Boulevard, Jamaica, New York with NP Levtsenko. MK, DK, and MM were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with the Defendants, after their initial examinations MK, DK, and MM were issued prescriptions from NP Levtsenko for Diclofenac Sodium Gel 3%, Lidocaine 5% Ointment, and cyclobenzaprine which were dispensed and billed by Acutus Rx.

v. On March 21, 2020, three Insureds – RG, MT, and RD – were involved in the same automobile accident. Thereafter, RG, MT, and RD received treatment with Metro Pain at a No-Fault Clinic located at 90-16 Sutphin Boulevard, Jamaica, New York with Dr. Pak and Dr. Wallace. RG, MT, and RD were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with the Defendants, after their initial examinations RG, MT, and RD were issued prescriptions from Dr. Pak and Dr. Wallace for Diclofenac Sodium Gel 3% which were dispensed and billed by Acutus Rx.

vi. On October 7, 2020, two Insureds – EC and MC – were involved in the same automobile accident. Thereafter, EC and MC received treatment with Metro Pain at a No-Fault Clinic located at 90-16 Sutphin Boulevard, Jamaica, New York with Dr. Elton. EC and MC were in different physical conditions and experienced

the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with the Defendants, after their initial examinations EC and MC were issued prescriptions from Dr. Elton for Diclofenac Sodium Gel 3% which were dispensed and billed by Acutus Rx.

vii. On March 1, 2021, two Insureds – JJ and SJ – were involved in the same automobile accident. Thereafter, JJ and SJ received treatment with Metro Pain at a No-Fault Clinic located at 90-16 Sutphin Boulevard, Jamaica, New York with Dr. Alleyne. JJ and SJ were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with the Defendants, after their initial examinations JJ and SJ were issued prescriptions from Dr. Alleyne for Lidocaine 5% Ointment, Celecoxib, and Cyclobenzaprine which were dispensed and billed by Acutus Rx.

viii. On September 20, 2020, two Insureds – AE and LM – were involved in the same automobile accident. Thereafter, AE and LM received treatment with Metro Pain at a No-Fault Clinic located at 90-16 Sutphin Boulevard, Jamaica, New York with Dr. Elton. AE and LM were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with the Defendants, after their initial examinations AE and LM were issued prescriptions from Dr. Elton for Diclofenac Sodium Gel 3% which were dispensed and billed by Acutus Rx.

ix. On June 27, 2020, three Insureds – JB, AA, and AM – were involved in the same automobile accident. Thereafter, JB, AA, and AM received treatment with Metro Pain at a No-Fault Clinic located at 90-16 Sutphin Boulevard, Jamaica, New York with Dr. Elton. JB, AA, and AM were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with the Defendants, after their initial examinations JB, AA, and AM were issued prescriptions from Dr. Elton for Diclofenac Sodium Gel 3% and Lidocaine 5% Ointment which were dispensed and billed by Acutus Rx. However, according to Dr. Elton's treatment reports for JB, AA, and AM, only Diclofenac Sodium Gel 3% was prescribed.

### i. The Fraudulent Diclofenac Gel and Lidocaine Ointment Prescriptions

78. In accordance with the fraudulent scheme discussed above, Acutus Rx primarily and routinely billed GEICO for exorbitantly priced Fraudulent Topical Pain Products primarily in the form of Diclofenac Sodium Gel 3% ("Topical Diclofenac") and Lidocaine 5% Ointment,

24

pursuant to duplicitous prescriptions solicited from Prescribing Providers and/or Clinic Controllers in exchange for kickbacks or other financial incentives.

79.    Topical Diclofenac is a topical nonsteroidal anti-inflammatory drug ("NSAID typically used to treat joint pain caused by osteoarthritis in the hands, wrists, elbows, knees, ankles, or feet. It has not been proven effective for treating strains or sprains.

80.    The Defendants nevertheless solicited the Prescribing Providers and the Clinic Controllers to provide them with voluminous prescriptions for Topical Diclofenac because the Defendants could readily buy Topical Diclofenac at low cost but have Acutus Rx bill GEICO and other New York No-Fault insurers huge sums based on egregiously high wholesale prices.

81.    The Defendants almost exclusively dispensed and billed for Topical Diclofenac in the form of Diclofenac Sodium Gel 3%, typically billing between $1,887.14 to $2,359.00 for a single tube of gel. The Defendants' total billing submitted through Acutus Rx to GEICO for Topical Diclofenac exceeds $1,000,000.00.

82.    Notably, Diclofenac Sodium Gel 3% is only approved for precancerous skin treatment know as actinic keratosis.

83.    Further, the United States Food and Drug Administration ("FDA") requires that diclofenac sodium prescriptions contain a "Black Box Warning" indicating the potential for serious cardiovascular and gastrointestinal risks.

84.    A "Black Box Warning" is the strictest warning attached to the labeling of a prescription drug or product by the FDA and is designed to call attention to serious or life-threatening risks associated with the drug or product.

85.    Specifically, with every diclofenac sodium prescription, the FDA requires the patient be warned that: (i) diclofenac sodium may cause an increased risk of serious cardiovascular

25

thrombotic events, myocardial infarction, and stroke, which can be fatal; and (ii) diclofenac sodium may cause an increased risk of serious adverse gastrointestinal events including bleeding, ulceration, and perforation of the stomach or intestines, which can be fatal.

86.    Notwithstanding the most common uses for Topical Diclofenac, or the risks associated with the drug, the Defendants steered the Prescribing Providers to prescribe diclofenac sodium in the form of Topical Diclofenac, while they oftentimes recommended the patient continue the use of oral NSAIDs or simultaneously prescribed oral NSAIDs – such as celecoxib, or naproxen – and other Fraudulent Pharmaceuticals including additional Fraudulent Topical Pain Products such as Lidocaine 5% Ointment.

87.    Prescribing Topical Diclofenac, while simultaneously prescribing or recommending the patient take oral NSAIDs, is therapeutic duplication which results in increased risk of adverse events with no additional therapeutic benefit.

88.    Therapeutic duplication is the prescribing and dispensing of two or more drugs from the same therapeutic class – such as oral and topical NSAIDs (e.g., naproxen and Diclofenac Gel 3%) – which puts the patient at greater risk of adverse drug reactions without providing any additional therapeutic benefit.

89.    Each year in the United States, approximately 4.5 million ambulatory care visits and 100,000 deaths occur as a result of adverse drug reactions.  A substantial number of these adverse drug reactions are the result of improper prescription practices associated with therapeutic duplication.  See, Mathew Witry, PharmD, PhD, Medication List Discrepancies and Therapeutic Duplications Among Dual Use Veterans, Federal Practitioner, 14 (September 2016).

90.    Nevertheless, Prescribing Providers consciously prescribed and the Defendants consciously dispensed Topical Diclofenac in conjunction with oral NSAIDs and/or Fraudulent

Topical Pain Products to numerous Insureds, thereby engaging in therapeutic duplication, despite the risks it posed to the Insureds' health and well-being.

91.   In the instant matter, by engaging in such therapeutic duplication, the Prescribing Providers and the Defendants put patients at increased risk of serious cardiovascular and gastrointestinal events (without any additional therapeutic benefit) as the use of oral NSAIDs increases the "Black Box Warning" risks associated with diclofenac sodium.

92.   The Prescribing Providers engaged in therapeutic duplication by simultaneously prescribing oral NSAIDs and Topical Diclofenac, and/or other Fraudulent Topical Pain Products. For example:

i.   Insured AB was allegedly involved in a motor vehicle accident on September 15, 2020. Thereafter, AB sought treatment with Metro Pain at a No-Fault Clinic located at 90-16 Sutphin Boulevard, Jamaica, New York, and underwent an initial examination with Dr. Elton on September 22, 2020 where Dr. Elton prescribed Diclofenac Sodium Gel 3%. Despite the inherent risks of therapeutic duplication, AB received both a topical and an oral NSAID in the form of Diclofenac Sodium Gel 3% and Naproxen which were dispensed and billed by Acutus Rx on September 24, 2020. Notably, Dr. Elton testified under oath that he resigned from Metro Pain when he discovered they were forging his signature on prescriptions for medications, and forwarding those prescriptions to pharmacies.

ii.   Insured EJ was allegedly involved in a motor vehicle accident on August 20, 2020. Thereafter, EJ sought treatment with Metro Pain at a No-Fault Clinic located at 90-16 Sutphin Boulevard, Jamaica, New York, and underwent an initial examination with Dr. Elton on August 20, 2020. Despite the inherent risks of therapeutic duplication, Dr. Elton prescribed both a topical and an oral NSAID in the form of Diclofenac Sodium Gel 3% and Celecoxib which were dispensed and billed by Acutus Rx on September 11, 2020.

iii.   Insured JO was allegedly involved in a motor vehicle accident on February 2, 2021. Thereafter, JO sought treatment with Metro Pain at a No-Fault Clinic located at 90-16 Sutphin Boulevard, Jamaica, New York, and underwent an initial examination with NP Rampershad on February 11, 2021. Despite the inherent risks of therapeutic duplication, NP Rampershad prescribed topicals and an oral NSAID in the form of Diclofenac Sodium Gel 3%, Lidocaine Patches and Naproxen. However, still despite the inherent risks of therapeutic

duplication, Acutus Rx dispensed and billed for Celecoxib and Lidocaine Patches on March 4, 2021 pursuant to prescriptions written by NP Rampershad.

iv. Insured GS was allegedly involved in a motor vehicle accident on December 11, 2020. Thereafter, GS sought treatment with Metro Pain at a No-Fault Clinic located at 90-16 Sutphin Boulevard, Jamaica, New York, and underwent an initial examination with NP Rampershad on December 15, 2020. Despite the inherent risks of therapeutic duplication, NP Rampershad prescribed both a topical and an oral NSAID in the form of Diclofenac Sodium Gel 3% and Naproxen which were dispensed and billed by Acutus Rx approximately six weeks later on February 3, 2021.

v. Insured MD was allegedly involved in a motor vehicle accident on December 10, 2020. Thereafter, MD sought treatment with Metro Pain at a No-Fault Clinic located at 90-16 Sutphin Boulevard, Jamaica, New York, and underwent an initial examination with NP Rampershad on December 15, 2020. Despite the inherent risks of therapeutic duplication, NP Rampershad prescribed both a topical and an oral NSAID in the form of Diclofenac Sodium Gel 3% and Naproxen which were dispensed and billed by Acutus Rx approximately six weeks later on February 2, 2021.

vi. Insured RM was allegedly involved in a motor vehicle accident on December 1, 2020. Thereafter, RM sought treatment with Metro Pain at a No-Fault Clinic located at 90-16 Sutphin Boulevard, Jamaica, New York, and underwent an initial examination with NP Rampershad on December 23, 2020. Despite the inherent risks of therapeutic duplication, NP Rampershad prescribed both a topical and an oral NSAID in the form of Diclofenac Sodium Gel 3% and Naproxen, as well as Cyclobenzaprine, which were dispensed and billed by Acutus Rx approximately six weeks later on February 4, 2021.

vii. Insured MR was allegedly involved in a motor vehicle accident on December 11, 2020. Thereafter, MR sought treatment with Metro Pain at a No-Fault Clinic located at 90-16 Sutphin Boulevard, Jamaica, New York, and underwent an initial examination with NP Rampershad on February 3, 2021. Despite the inherent risks of therapeutic duplication, NP Rampershad prescribed both a topical and an oral NSAID in the form of Diclofenac Sodium Gel 3% and Celecoxib which were dispensed and billed by Acutus Rx approximately four weeks later on March 5, 2021.

viii. Insured DM was allegedly involved in a motor vehicle accident on July 18, 2020. Thereafter, DM sought treatment with Metro Pain at a No-Fault Clinic located at 90-16 Sutphin Boulevard, Jamaica, New York, and underwent an initial examination with Dr. Elton on August 11, 2020. Dr. Elton did not document any medication under the treatment plan section of the examination report, thereby, indicating no medication was recommended or prescribed. Despite the inherent risks of therapeutic duplication, on November 2, 2020,

28

Acutus Rx dispensed and billed for both a topical and an oral NSAID in the form of Diclofenac Sodium Gel 3% and Celecoxib which were allegedly prescribed by Dr. Elton four weeks earlier on September 10, 2020, even though he did not examine the Insured on that date.

93.     Not only are these practices part of a fraudulent scheme designed to maximize profit, but they also pose a risk to – and show a genuine disregard for – patient health and safety as they constitute therapeutic duplication and increase the risk of adverse drug reactions to the patients subjected to them.

94.     The Topical Diclofenac was prescribed pursuant to collusive arrangements and predetermined treatment protocols, and without regard for patient care and safety, or the commercial availability of a wide range of FDA-approved medications, as well as over-the-counter medications, proven to have therapeutic effects and available at a fraction of the cost.

95.     In keeping with the fact that Topical Diclofenac was prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care and safety, the initial examination reports prepared by the Prescribing Providers virtually never stated the medical basis for the prescriptions.

96.     In further keeping with the fact that the Topical Diclofenac was prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care, the follow-up examination reports performed by the Prescribing Providers virtually never addressed whether the Topical Diclofenac prescribed provided any pain relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

97.     In addition to the egregious number of Topical Diclofenac prescriptions dispensed by the Defendants, the Defendants routinely billed GEICO for exorbitantly priced topical

Lidocaine 5% Ointment, pursuant to duplicitous prescriptions solicited from the Prescribing Providers and Clinic Controllers in exchange for kickbacks or other incentives.

98.     Lidocaine 5% Ointment is primarily indicated for temporary pain relief associated with minor burns and skin irritations such as sunburn, insect bites, poison ivy, poison oak, poison sumac, abrasions of the skin and insect bites, or as a topical anesthetic for minor procedures such as sutures or injections.

99.     Lidocaine is a local anesthetic (numbing medication) that works by blocking nerve signals in the top few millimeters of skin. Lidocaine does not penetrate the skin enough to treat deep musculoskeletal pain.

100.     Excessive dosage or short intervals between doses of Lidocaine 5% Ointment can cause serious adverse effects including, among others, bradycardia, hypotension, and cardiovascular collapse that may lead to cardiac arrest. Accordingly, patients should be instructed to strictly adhere to the recommended dosage and a single application of Lidocaine 5% Ointment should not exceed 5 grams. However, the Prescribing Providers often failed to include a maximum daily dose for Lidocaine 5% Ointment prescriptions written to Acutus Rx's patients.

101.     Despite this, the Prescribing Providers never recommended Insureds first use over-the-counter lidocaine ointments or lotions to treat their minor aches and pains which they sustained in fender-bender type motor vehicle accidents. Rather, pursuant to collusive arrangements and predetermined protocols, the Prescribing Providers and Clinic Controllers routinely prescribed to Insureds, or caused the prescription of, Lidocaine 5% Ointment and directed the prescriptions to Acutus Rx.

102.     Further, to the extent that topical lidocaine ointment is effective for treating certain specific conditions, the Lidocaine 5% Ointment dispensed by the Defendants is only marginally

stronger or more effective than over-the-counter 4% lidocaine yet costs exponentially more. Rather than provide more conservative, cost-effective treatment, the Prescribing Providers, pursuant to their collusive agreements with the Defendants, virtually never directed the Insureds to try OTC 4% lidocaine prior to prescribing the Lidocaine 5% Ointment, in order to exploit the Insureds for financial gain.

103.     For example, the Prescribing Providers never recommended insureds first try OTC lidocaine products, such as Icy Hot Lidocaine which contains 4% lidocaine, available at most well-known pharmacy retailers at a mere fraction of the cost.

104.     Acutus Rx typically billed GEICO $1,219.04 for a single tube of Lidocaine 5% Ointment and, to-date, has submitted over $152,000.00 in claims to GEICO seeking reimbursement of Lidocaine 5% Ointment.

105.     In keeping with the fact that the Defendants submitted bills pursuant to collusive arrangements with the Prescribing Providers and Clinic Controllers and pursuant to fraudulent, predetermined and profit-driven treatment protocols, the Lidocaine 5% Ointment prescriptions were often issued contemporaneous to oral NSAIDs and/or other Fraudulent Topical Pain Products such as Topical Diclofenac.  For example:

    i.    Insured RB was allegedly involved in a motor vehicle accident on March 3, 2021. Thereafter, RB sought treatment with Metro Pain at a No-Fault Clinic located at 90-16 Sutphin Boulevard, Jamaica, New York, and underwent an initial examination with Dr. Alleyne on March 5, 2021. Dr. Alleyne prescribed Lidocaine 5% Ointment, Naproxen, and Cyclobenzaprine.  On March 9, 2021, Acutus Rx dispensed and billed for Lidocaine 5% Ointment, *Celecoxib*, and Cyclobenzaprine pursuant to Dr. Alleyne's prescriptions.

    ii.    Insured DN was allegedly involved in the same motor vehicle accident as RB, supra, on March 3, 2021. Thereafter, DN sought treatment with Metro Pain at a No-Fault Clinic located at 90-16 Sutphin Boulevard, Jamaica, New York, and underwent an initial examination with Dr. Alleyne on March 5, 2021. Dr. Alleyne prescribed Lidocaine 5% Ointment, Naproxen, and Cyclobenzaprine.

On April 5, 2021, Acutus Rx dispensed and billed for Lidocaine 5% Ointment, *Celecoxib*, and Cyclobenzaprine pursuant to Dr. Alleyne's prescriptions.

iii.   Insured JJ was allegedly involved in a motor vehicle accident on March 1, 2021. Thereafter, JJ sought treatment with Metro Pain at a No-Fault Clinic located at 90-16 Sutphin Boulevard, Jamaica, New York, and underwent an initial examination with Dr. Alleyne on March 5, 2021. Dr. Alleyne prescribed Lidocaine 5% Ointment, Naproxen, and Cyclobenzaprine.  On March 9, 2021, Acutus Rx dispensed and billed for Lidocaine 5% Ointment, *Celecoxib*, and Cyclobenzaprine pursuant to Dr. Alleyne's prescriptions.

iv.   Insured SJ was allegedly involved in the same motor vehicle accident as JJ, <u>supra</u>, on March 1, 2021. Thereafter, SJ sought treatment with Metro Pain at a No-Fault Clinic located at 90-16 Sutphin Boulevard, Jamaica, New York, and underwent an initial examination with Dr. Alleyne on March 5, 2021. Dr. Alleyne prescribed Lidocaine 5% Ointment, Naproxen, and Cyclobenzaprine. On March 9, 2021, Acutus Rx dispensed and billed for Lidocaine 5% Ointment, *Celecoxib*, and Cyclobenzaprine pursuant to Dr. Alleyne's prescriptions.

v.   Insured DK was allegedly involved in a motor vehicle accident on April 12, 2021. Thereafter, DK sought treatment with Metro Pain at a No-Fault Clinic located at 90-16 Sutphin Boulevard, Jamaica, New York, and underwent an initial examination with NP Levtsenko on April 14, 2021. NP Levtsenko did not document any medication under the treatment plan section of the examination report, thereby, indicating no medication was recommended or prescribed.  Nevertheless, on April 29, 2021, Acutus Rx dispensed and billed for Cyclobenzaprine, Lidocaine 5% Ointment, and Diclofenac Sodium Gel 3% pursuant to NP Levtsenko's prescriptions. Although these pharmaceuticals are not within the same drug class, both Diclofenac Sodium Gel 3% and Lidocaine 5% Ointment have associated potential cardiovascular risks.

vi.   Insured MK was allegedly involved in the same motor vehicle accident as DK, <u>supra</u>, April 12, 2021. Thereafter, MK sought treatment with Metro Pain at a No-Fault Clinic located at 90-16 Sutphin Boulevard, Jamaica, New York, and underwent an initial examination with Inna Levtsenko, N.P. NP Levtsenko on April 14, 2021. NP Levtsenko did not document any medication under the treatment plan section of the examination report, thereby, indicating no medication was recommended or prescribed.  Nevertheless, on April 29, 2021, Acutus Rx dispensed and billed for Cyclobenzaprine, Lidocaine 5% Ointment, and Diclofenac Sodium Gel 3% pursuant to NP Levtsenko's prescriptions. Although these pharmaceuticals are not within the same drug class, both Diclofenac Sodium Gel 3% and Lidocaine 5% Ointment have associated potential cardiovascular risks.

vii.   Insured TC was allegedly involved in a motor vehicle accident on October 5, 2020. Thereafter, TC sought treatment with Metro Pain at a No-Fault Clinic

32

located at 90-16 Sutphin Boulevard, Jamaica, New York, and underwent an initial examination with Dr. Elton on October 21, 2020. Dr. Elton prescribed Lidocaine 5% Ointment. Nevertheless, on November 2, 2020, Acutus Rx dispensed and billed for Lidocaine 5% Ointment *and two tubes of Diclofenac Sodium Gel 3%,* pursuant to Dr. Pak's prescriptions. Although these pharmaceuticals are not within the same drug class, both Diclofenac Sodium Gel 3% and Lidocaine 5% Ointment have associated potential cardiovascular risks.

viii.   Insured SA was allegedly involved in a motor vehicle accident on June 9, 2020. Thereafter, SA sought treatment with Metro Pain at a No-Fault Clinic located at 90-16 Sutphin Boulevard, Jamaica, New York, and underwent an initial examination with Dr. Pak on June 23, 2020. Dr. Pak prescribed Cyclobenzaprine and Lidocaine 5% Ointment. Nevertheless, on July 2, 2020, Acutus Rx dispensed and billed for Lidocaine 5% Ointment, *Diclofenac Sodium Gel 3%,* and Cyclobenzaprine pursuant to Dr. Pak's prescriptions. Although these pharmaceuticals are not within the same drug class, both Diclofenac Sodium Gel 3% and Lidocaine 5% Ointment have associated potential cardiovascular risks.

ix.   Insured RK was allegedly involved in a motor vehicle accident on April 27, 2020. Thereafter, RK sought treatment with Metro Pain at a No-Fault Clinic located at 90-16 Sutphin Boulevard, Jamaica, New York, and underwent an initial examination with Dr. Pak on April 28, 2020. Dr. Pak did not document any medication under the treatment plan section of the examination report, thereby, indicating no medication was recommended or prescribed. Nevertheless, on May 7, 2020, Acutus Rx dispensed and billed for Lidocaine 5% Ointment, Diclofenac Sodium Gel 3%, and Cyclobenzaprine pursuant to Dr. Pak's prescriptions. Dr. Pak's prescription for Lidocaine 5% Ointment failed to provide a maximum daily dosage for RK. Although these pharmaceuticals are not within the same drug class, both Diclofenac Sodium Gel 3% and Lidocaine 5% Ointment have associated potential cardiovascular risks.

x.   Insured EK was allegedly involved in a motor vehicle accident on January 23, 2021. Thereafter, EK sought treatment with Colin Clarke, M.D. ("Dr. Clarke") at a No-Fault Clinic located at 164-10 Crocheron Avenue, Flushing, New York, and underwent an examination on April 2, 2021. Dr. Clarke prescribed Diclofenac Sodium Gel 3% and Lidocaine 5% Ointment. On April 5, 2021, Acutus Rx dispensed and billed for Diclofenac Sodium Gel 3% and Lidocaine 5% Ointment pursuant to Dr. Clarke's prescriptions. Although these pharmaceuticals are not within the same drug class, both Diclofenac Sodium Gel 3% and Lidocaine 5% Ointment have associated potential cardiovascular risks.

106. As with the prescriptions for Topical Diclofenac, the initial examination reports prepared by the Prescribing Providers virtually never set forth the medical basis for the Lidocaine 5% Ointment prescriptions and, in some cases, failed to acknowledge that the patient was even being prescribed a Lidocaine 5% Ointment. Likewise, the follow-up examination reports virtually never addressed whether the Lidocaine 5% Ointment prescribed provided any pain relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

107. The Defendants' egregious billing coupled with the fact that the Prescribing Providers failed to properly document – or even document at all – the prescriptions for Topical Diclofenac and Lidocaine 5% Ointment, or the Insureds' use of these medications, further indicates that there was no legitimate medical reason for the Prescribing Providers to have prescribed large volumes of these medications to the Insureds, or for Acutus Rx to have dispensed such large volumes to the Insureds, particularly given the potential for adverse health effects.

C. **The Exploiting of Patients for Financial Gain Through the Illegal, Collusive Arrangements Among Acutus Rx, the Prescribing Providers and the Clinic Controllers**

108. To effectuate the fraudulent scheme, the Defendants steered the Prescribing Providers and/or Clinic Controllers to routinely prescribe and direct prescriptions to Acutus Rx for large volumes of the Fraudulent Topical Pain Products pursuant to their collusive arrangements, which egregiously inflated the charges submitted to GEICO.

109. New York's statutory framework provides, among other things, that pharmacies and licensed medical professionals are prohibited from (i) "exercising undue influence" on a patient by promoting the sale of drugs so as to exploit the patient for the financial gain, and (ii) "directly or indirectly" giving, soliciting, receiving, or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

34

110. New York's statutory framework also specifically prohibits collusive arrangements between licensed physicians and pharmacies involving compounded or specially marked prescriptions. See N.Y. Education Law § 6530(38) and § 6811(7). In fact, New York Education Law § 6811(7) makes such agreements criminal.

111. Here, the Defendants colluded with the Prescribing Providers and Clinic Controllers associated with various No-Fault Clinics, which treat thousands of Insureds, to have the Prescribing Providers, prescribe, or purport to prescribe, the Fraudulent Pharmaceuticals, including the Fraudulent Topical Pain Products, and then to have those prescriptions directed to Acutus Rx so that the Defendants could bill GEICO huge sums.

112. In furtherance of the scheme, the Prescribing Providers intentionally prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of the No-Fault Clinics pursuant to the collusive arrangements and fraudulent predetermined protocols, and without regard to genuine patient care, without regard to cost and attention to fiscal responsibility, and often without regard to pharmacologic outcomes.

113. The Prescribing Providers prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of the No-Fault Clinics, while the Defendants dispensed, or purported to dispense the Fraudulent Pharmaceuticals, despite their knowledge that they were involved in illegal, collusive arrangements designed to exploit the patients for financial gain; the Fraudulent Pharmaceuticals were often prescribed and dispensed without regard to pharmacologic outcomes; the Fraudulent Pharmaceuticals were prescribed and dispensed with gross indifference to patient health, care and safety; the Fraudulent Topical Pain Products were prescribed and dispensed as a matter of course without any recommendation that patients first try over-the-counter products; and that the Fraudulent Topical Pain Products were prescribed and dispensed without any attention to

35

cost and fiscal responsibility, given that there are FDA-approved drugs available and appropriate for the particular patients at significantly less cost.

114. The Defendants, in collusion with the Prescribing Providers and Clinic Controllers, made sure that the Insureds never had the option to use a pharmacy of their choosing, and instead ensured that the prescriptions for the Fraudulent Pharmaceuticals were directed to Acutus Rx, notwithstanding that (i) in many instances the No-Fault Clinics and the patients themselves were located in counties far from Acutus Rx in Nassau County, New York and (ii) there were countless other pharmacies located much closer to the No-Fault Clinics and the patients.

115. In many cases, Acutus Rx purported to mail or deliver the Fraudulent Pharmaceuticals directly to the Insureds' homes without the patient even knowing that they were to receive a Fraudulent Pharmaceutical.

116. Alternatively, the Insureds were given the Fraudulent Pharmaceuticals dispensed by Acutus Rx directly from the front desk staff at the various No-Fault Clinics, again without ever even knowing that they were to receive a Fraudulent Pharmaceutical.

117. The Defendants, the Prescribing Providers and the Clinic Controllers did not give the Insureds the option to identify a pharmacy of their choosing to ensure that the prescriptions were filled by Acutus Rx, and to ensure that the Defendants benefitted financially from the prescriptions.

118. The Prescribing Providers had no legitimate medical reason to prescribe, and the Defendants had no legitimate medical reason to dispense, the Fraudulent Pharmaceuticals in large quantities to their patients, which were often duplicative of other pharmaceuticals prescribed and dispensed.

119.    The Prescribing Providers and the Clinic Controllers had no legitimate reason to direct the prescriptions for the Fraudulent Pharmaceuticals to Acutus Rx rather than to a multitude of other pharmacies that were equally capable of dispensing the prescriptions and often more convenient to many of the patients.

120.    The Defendants, the Prescribing Providers and the Clinic Controllers would not have engaged in the illegal, collusive arrangements in violation of New York law, including intentionally prescribing the Fraudulent Pharmaceuticals and directing those prescriptions to Acutus Rx, unless they profited from their participation in the illegal scheme.

121.    But for the payments of kickbacks or other financial incentives from the Defendants, the Prescribing Providers would not have prescribed the Fraudulent Topical Pain Products, or the volume of other Fraudulent Pharmaceuticals, and the Prescribing Providers and Clinic Controllers would not have directed the prescriptions to Acutus Rx.

122.    The Defendants, Prescribing Providers, and Clinic Controllers affirmatively concealed the particular amounts paid for the kickbacks since such kickbacks are in violation of New York law.

123.    Nevertheless, based on the circumstances surrounding the illegal, collusive, arrangements, the Defendants paid a financial kickback or provided other financial incentives, and the Prescribing Providers and Clinic Controllers received a financial kickback or other financial incentives, for each of the particular prescriptions for the Fraudulent Pharmaceuticals that were dispensed by Acutus Rx.

124.    Upon information and belief, the payment of kickbacks by the Defendants was made at or near the time the prescriptions were issued.

**D.** **The Fraudulent Billing the Defendants Submitted or Cause to be Submitted to GEICO**

125.    Every prescription product, whether a brand name or generic drug, has a designated national drug code ("NDC") – a unique 10-digit code that identifies the drug itself, the vendor of the drug and the quantity in which the drug was packaged.  Each NDC number has an assigned Average Wholesale Price ("AWP").

126.    Each NDC (and, thus, the AWP) for a particular prescription product differs depending on both the particular supplier the drug is purchased from and the quantity in which the drug is obtained.  The same drug can have a different NDC number if it is purchased from a different supplier and/or in different quantities.

127.    Pursuant to 12 N.Y.C.R.R. §§ 440.5(a) and (d) (the "Pharmacy Fee schedule"), for each brand name drug (or ingredient included in a compounded product) a provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 12% of the AWP, plus a single dispensing fee of $4.00.

128.    For each generic drug (or ingredient included in a compounded product) the provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 20% of the AWP, plus a single dispensing fee of $5.00.

129.    The Defendants solicited the Clinic Controllers and the Prescribing Providers to provide them with voluminous prescriptions for the Fraudulent Topical Pain Products because the Defendants could readily buy the Fraudulent Topical Pain Products at low cost but bill GEICO and other New York No-Fault insurers inflated amounts based on egregiously high wholesale prices.

130. The Defendants intentionally targeted the Fraudulent Topical Pain Products, with extremely expensive "average wholesale prices," in order to inflate Acutus Rx's billing and maximize their profits.

131. In support of their charges, the Defendants typically submitted a "No-Fault" form, known as an NF-3 Form, which included the purported NDC numbers, units, and corresponding charges for each drug product or ingredient.

132. The NDC numbers listed on the NF-3 Forms submitted by the Defendants are what identified the purported AWPs for each of the Fraudulent Pharmaceuticals.

133. The Defendants never submitted to GEICO their wholesale purchase invoices demonstrating how much Acutus Rx actually paid the supplier for the Fraudulent Topical Pain Products.

134. The Defendants never submitted to GEICO any documents evidencing whether Acutus Rx actually purchased topical pain products with the particular NDC number used in the billing, representing purchases from a particular supplier in a particular quantity.

135. In fact, Acutus Rx never actually paid the targeted and egregious "average wholesale price" of the Fraudulent Topical Pain Products that it dispensed, or purported to dispense, because it is not a true representation of actual market price and is far above the actual acquisition cost for Fraudulent Topical Pain Products.

136. Acutus Rx paid only a fraction of the "average wholesale price" of the Topical Diclofenac that the Defendants targeted to use in connection with Acutus Rx's billing, but nevertheless billed GEICO and other No-Fault insurers egregious amounts far surpassing the cost of an array of other FDA approved, proven effective medications or commercially available over-the-counter products.

137.   Further, upon information and belief, Acutus Rx often did not actually purchase topical pain products with the particular NDC number used in the billing, and instead purchased topical pain products from different suppliers and/or in different quantities but nonetheless used the NDC number in their billing that generated the highest reimbursement amount in order to inflate the Defendants' profits.

## IV.   The Defendants' Submission of Fraudulent NF-3 Forms to GEICO

138.   To support the fraudulent charges, statutorily prescribed claim forms for No-Fault Benefits consistently have been submitted to GEICO by and on behalf of Acutus Rx seeking payment for pharmaceuticals for which Acutus Rx is ineligible to receive.

139.   These forms, including NF-3 forms, HCFA-1500 forms and other supporting records that the Defendants submit or cause to be submitted to GEICO, are false and misleading in the following material respects:

i.      The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Fraudulent Pharmaceuticals were medically necessary and intended for genuine patient care. In fact, the Fraudulent Pharmaceuticals were not medically necessary and were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain without regard for genuine patient care;

ii.     The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Defendants did not comply with all material licensing requirements in that the Defendants engaged in illegal, collusive relationships with the Prescribing Providers and/or Clinic Controllers in order to steer voluminous and illegal prescriptions to Acutus Rx for the Fraudulent Pharmaceuticals, in exchange for the payment of kickbacks and other financial incentives;

iii.    The NF-3 forms, HCFA-1500 forms and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R.

40

§ 65-3.16(a)(12). In fact, the Defendants did not comply with all material licensing requirements in that the Defendants intentionally targeted a specific set of pharmaceutical products that they could acquire at low cost and dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals; and

iv. The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Defendants did not comply with all material licensing requirements in that they dispensed the Fraudulent Pharmaceuticals pursuant to illegal, invalid, and duplicitous prescriptions.

## V. **The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

140. The Defendants are legally and ethically obligated to act honestly and with integrity in connection with the provision of pharmaceutical products to the Insureds and the billing they submit or cause to be submitted to GEICO seeking reimbursement for these products.

141. To induce GEICO to promptly pay the charges for the Fraudulent Pharmaceuticals, the Defendants have gone to great lengths to systematically conceal their fraud.

142. Specifically, the Defendants knowingly misrepresented and concealed facts in an effort to prevent discovery that (i) the Fraudulent Pharmaceuticals were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; and (ii) the Defendants were involved in collusive kickback arrangements with the Prescribing Providers and/or Clinic Controllers designed to generate voluminous prescriptions solely to maximize the billing submitted to GEICO and other New York insurance companies.

143. The Defendants also billed for the Fraudulent Pharmaceuticals based on purported prescriptions from multiple Prescribing Providers operating from multiple No-Fault Clinics in order to reduce the amount of billing based on any single licensee.

41

144. The billing and supporting documentation submitted by the Defendants for the Fraudulent Pharmaceuticals, when viewed in isolation, did not reveal its fraudulent nature.

145. The Defendants have hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely file expensive and time-consuming litigation against GEICO and other insurers if the charges are not promptly paid in full. In fact, Acutus Rx continues to have legal counsel pursue collection against GEICO and other insurers without regard for the fact that Acutus Rx has been engaged in fraud.

146. GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents that were submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of approximately $352,600.00 representing payments made by GEICO based upon the fraudulent charges submitted by the Defendants.

147. Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### THE FIRST CLAIM FOR RELIEF
**Against Acutus Rx**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

148. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

149. There is an actual case in controversy between GEICO and Acutus Rx – regarding approximately $947,435.00 in pending fraudulent billing for the Fraudulent Pharmaceuticals that the Defendants submitted or caused to be submitted to GEICO through Acutus Rx.

150.    Acutus Rx has no right to receive payment for any pending bills submitted to GEICO because Acutus Rx billed for Fraudulent Pharmaceuticals, which were medically unnecessary, and were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard to genuine patient care.

151.    Acutus Rx has no right to receive payment for any pending bills submitted to GEICO because the Defendants participated in illegal, collusive agreements in which the Defendants steered the Prescribing Providers and/or Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Acutus Rx in exchange for unlawful kickbacks and other financial incentives.

152.    Acutus Rx has no right to receive payment for any pending bills submitted to GEICO because the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that Acutus Rx dispensed in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals solely for financial gain in violation of law.

153.    Acutus Rx has no right to receive payment for any pending bills submitted to GEICO because the Defendants made and continue to make false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals dispensed by Acutus Rx pursuant to illegal, invalid, and duplicitous prescriptions.

154.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Acutus Rx has no right to receive payment for any pending bills submitted to GEICO.

## THE SECOND CLAIM FOR RELIEF
### Against Patel
### Violation of RICO, 18 U.S.C. § 1962(c))

155.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

156.    Acutus Rx is an ongoing "enterprise", as that term is defined in 18 U.S.C § 1961(4), that engages in activities which affect interstate commerce.

157.    Patel knowingly conducted and/or participated, directly or indirectly, in the conduct of Acutus Rx's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of United States mail to submit or cause to be submitted thousands of fraudulent charges for over two years, seeking payments that Acutus Rx was not eligible to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary and/or the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and/or Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Acutus Rx in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally targeted a specific set of pharmaceuticals that they dispensed in large volumes to Insureds with exorbitant charges, in place, of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; and (iv) the billed-for services were the product of illegal, invalid, and duplicitous prescriptions. A sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

44

158. Acutus Rx's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in Patel operated Acutus Rx, inasmuch as Acutus Rx was never eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Acutus Rx to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants actively continue to attempt collection on the fraudulent billing submitted through Acutus Rx to the present day.

159. Acutus Rx is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it was created to exploit the New York "No-Fault" insurance system; engage in illegal, collusive arrangements involving prescriptions for the Fraudulent Pharmaceuticals; and bill pursuant to predetermined fraudulent protocols solely to financially enrich the Defendants. These inherently unlawful acts are taken by Acutus Rx in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

160. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $352,600.00 pursuant to the fraudulent bills submitted by the Defendants through Acutus Rx.

161. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fee pursuant to 18 U.S.C. § 1961(4), any other relief the Court deems just and proper.

45

## THE THIRD CLAIM FOR RELIEF
### Against Patel
### (Violation of RICO, 18 U.S.C. § 1962(d))

162.     Acutus Rx is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

163.     Patel is employed by or associated with the Acutus Rx enterprise.

164.     Patel knowingly agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Acutus Rx's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges over more than two years seeking payments that Acutus Rx was not eligible to receive under the New York no-fault insurance laws because: (i) the billed-for services were not medically necessary and/or the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and/or Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Acutus Rx in exchange for unlawful kickbacks and other financial incentives; (iii) the Defendants intentionally targeted a specific set of pharmaceuticals that they dispensed in large volumes to Insureds with exorbitant charges, in place, of other effective, less costly pharmaceuticals solely for financial gain, in violation of law; and (iv) the billed-for services were the product of illegal, invalid, and duplicitous prescriptions. A sample of the fraudulent bills and corresponding mailings submitted through Acutus Rx to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

165.    Patel knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

166.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $352,600.00 pursuant to the fraudulent bills submitted by the Defendants through Acutus Rx.

167.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**THE FOURTH CLAIM FOR RELIEF**
**Against Acutus Rx and Patel**
**(Common Law Fraud)**

168.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

169.    Acutus Rx and Patel intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Pharmaceuticals under the name of Acutus Rx.

170.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the billed-for services were medically necessary and properly billed when in fact the billed-for services were not medically necessary and/or were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (ii) in every claim, the representation that Acutus Rx was acting in accordance with material licensing requirements and,

therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and/or Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Acutus Rx in exchange for unlawful kickbacks or other financial incentives; (iii) in every claim, the representation that Health Choice Pharmacy was acting in accordance with material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants intentionally targeted a specific set of pharmaceutical products that they could dispense in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals solely for financial gain, in violation of law of New York State regulatory and licensing requirements; (iv) in every claim, the representation that Acutus Rx was acting in accordance with material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the billed-for services were the product of illegal, invalid, and duplicitous prescriptions, rendering the pharmacy ineligible to receive reimbursement for No-Fault benefits.

171. The Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Acutus Rx that were not compensable under the No-Fault Laws.

172. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid approximately $352,600.00 pursuant to the fraudulent bills submitted, or caused to be submitted, by the Defendants through Acutus Rx.

173.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

174.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**THE FIFTH CLAIM FOR RELIEF**
**Against Acutus Rx, Patel, and Kapree Holdings**
**(Unjust Enrichment)**

175.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

176.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

177.    When GEICO paid the bills and charges submitted by or on behalf of Acutus Rx for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

178.    Acutus Rx, Patel, and Kapree Holdings have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted and profited from, as a result of, among other things, the payments received and the receipt of kickback payments, notwithstanding their improper, unlawful, and unjust fraudulent billing scheme.

179.    The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity, and good conscience.

180.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in the approximate amount of $352,600.00.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgment be entered in their favor and against the Defendants, as follows:

A.      On the First Claim for Relief against Acutus Rx, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the Defendants have no right to receive payment for any pending bills, amounting to approximately $947,435.00, submitted to GEICO through Acutus Rx;

B.      On the Second Claim For Relief against Patel, damages in favor of GEICO in an amount to be determined at trial but approximately $352,600.00, together with treble damages, attorneys' fees, costs, interest and such other and further relief as this Court deems just and proper;

C.      On the Third Claim for Relief against Patel, damages in favor of GEICO in an amount to be determined at trial but approximately $352,600.00, together with treble damages, attorneys' fees, costs, interest and such other and further relief as this Court deems just and proper;

D.      On the Fourth Claim for Relief against Acutus Rx and Patel, a recovery in favor of GEICO in an amount to be determined at trial but approximately $352,600.00, together with punitive damages, costs, interest, and such other and further relief as the Court deems just and proper; and

E.      On the Fifth Claim for Relief against all Defendants, an amount to be determined at trial but approximately $352,600.00, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated: Uniondale, New York
       September 22, 2022

                        RIVKIN RADLER LLP

                        By:      /s/ *Michael A. Sirignano, Esq.*
                              Michael A. Sirignano

Barry I. Levy
Steven Henesy, Esq.
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*

51